IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

John Pena Jr.,               )
                      )
        Plaintiff,      )    No. CV 08-615-TUC-RCC-DTF
                      )
vs.                   )    **REPORT AND RECOMMENDATION**
                      )
Michael J. Astrue, Commissioner   )
of  Social Security,        )
                      )
        Defendant.     )
_____)

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). This case presents six issues on appeal: whether the Administrative Law Judge (ALJ) failed to give Plaintiff's treating doctor's opinion proper weight; whether the ALJ failed to consider and weigh the Department of Veterans Affairs' (VA) Rating Decisions; whether the ALJ failed to consider Plaintiff's physical impairments with respect to his residual functional capacity (RFC); whether the ALJ failed to evaluate Plaintiff's obesity; whether the ALJ erred by failing to consider lay witness testimony; and whether the ALJ erred by not obtaining supplemental vocational evidence. Based on the pleadings and the administrative record submitted to the Court, the Magistrate Judge recommends the District Court, after its independent review, remand for benefits.

# PROCEDURAL HISTORY

Plaintiff filed an application for Social Security disability insurance benefits (DIB) in August 2004. (Administrative Record (AR) 195). Plaintiff alleged disability from February 28, 2003, which was amended to May 12, 2003, to present. (AR 71, 191.) A hearing was held on January 11, 2006, after which ALJ Norman Buls found Plaintiff not disabled at step five because, although he could not perform his past relevant work, he could perform other work in the economy. (AR 76-85.) Upon request, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings, directing the ALJ to address the claimant's obesity; explain the weight given to the VA disability rating; obtain additional evidence regarding the claimant's mental condition; and obtain supplemental evidence from a vocational expert, if warranted. (AR 159-60.) After remand, a second hearing was held before ALJ Buls on November 21, 2007. (AR 60-73.) Subsequent to that hearing, the ALJ found Plaintiff was not disabled at step four because he could perform his past relevant work as a laborer (water truck driver). (AR 10-21.) The Appeals Council denied Plaintiff's second request to review the ALJ's decision. (AR 6.)

# FACTUAL HISTORY

Plaintiff was born on July 23, 1949, making him 55 years of age at the time he filed his DIB application. (AR 189.) Plaintiff began working in 1966; his work record is inconsistent with several patterns of progressively increasing salaries followed by a drop in earnings. (AR 189-90.) Plaintiff served in the military from June 1967 to June 1970; he served in Vietnam during the 1968 and 1969 Tet offensives and was reportedly exposed to Agent Orange. (AR 191, 266.) Beginning in 1994, Plaintiff served nineteen months in prison for transporting marijuana. (AR 141, 193.)

## Physical Impairments

Plaintiff was diagnosed with and treated for several physical ailments at the Southern Arizona VA Medical Center (VAMC). He was diagnosed with acute asthma on July 30, 2002 (AR 357), and he took multiple medications at any given time to prevent the symptoms and to

assist with shortness of breath (AR 361-65, 372, 703-05, 710, 712-13, 715-16, 719-21, 785, 787-88, 793-95.)  Plaintiff was diagnosed with type two diabetes as of 1997 (AR 359); in September 2006, Plaintiff was started on insulin (AR 972, 976-77).  On December 8, 2004, Plaintiff was diagnosed with sleep apnea.  (AR 386, 775.)  Although he was prescribed a CPAP machine and reported sleeping better, in August 2005, he still experienced daytime sleepiness.  (AR 860, 863.)  In November 2004, Plaintiff was diagnosed with a left knee injury (AR 352, 411), for which he received a brace with a metal support (AR 381-82, 405).

**VAMC Mental Health Evidence**

In August 2002 (continuing through March 2004), Plaintiff began counseling at the Vet Center due to Posttraumatic Stress Disorder (PTSD) and depression.  (AR 441-54.)  Plaintiff completed an inpatient PTSD treatment program at the VAMC from May 12 to May 30, 2003.  (AR 488, 627-76.)  Upon admission, Plaintiff reported nightmares, social isolation, hyperarousal, depression with decreased energy, tearfulness, irritability and anger.  (AR 489.)

From June to October 2003, Plaintiff saw VAMC therapist George Lawson, due to his PTSD and depression.  During that time, Plaintiff reported significant sleep disturbances, with some improvement, anger problems and irritability.  (AR 601, 615, 619-20.)  From December 2003 to April 2005, Plaintiff attended individual therapy at the VAMC with Suzanne Perkins, MSW.  (AR 593, 901.)  He periodically reported that he was spending a lot of time alone in his room.  (AR 396, 593.)  On September 24, 2004, Perkins noted that Plaintiff was distracted and easily lost his train of thought.  (AR 424.)  In October 2004, Plaintiff reported that the vocational rehabilitation program had removed him from school due to his anxiety.  (*Id.*)

On April 5, July 28, and September 1, 2004, Plaintiff reported to the VAMC emergency unit due to intense symptoms of PTSD, anxiety, anger, panic and/or depression.  (AR 432-34, 546-60, 571.)

In April and May 2005, at the VAMC, Plaintiff attended the Mindfulness-based Stress Reduction Group (884, 893, 894, 896, 897, 900), the Anger Management Group (AR 881, 882, 884, 894, 895, 898), and the Interpersonal Skills Group (AR 882, 883, 894, 896).  In October,

November, and December 2005, Plaintiff participated in a Relapse Group.  (AR 812, 813, 817, 818, 820, 1023.)  In November 2005, in a PTSD Medication Management Group, Plaintiff reported increased forgetfulness (which was observed in group), and it was noted that he required repeated directions to understand and interpret information.  (AR 813-14.)

**Treating Psychiatrist**

On September 18, 2003, Dr. Christopher Petro, who became thereafter Plaintiff's treating VAMC psychiatrist, first saw Plaintiff for a medication review.  (AR 513-14.)  Dr. Petro saw Plaintiff approximately every two months through 2005, and then several times a year through 2007. Through July 2005, Dr. Petro described Plaintiff's mood as some combination of anxious, irritable and/or depressed at each appointment.  (AR 391, 418, 514, 542, 556, 565, 583, 596, 868, 886, 904 .)  With a few exceptions after that, Dr. Petro indicated Plaintiff's mood was sad or depressed.  (AR 1056, 1062, 1077.)

At the first appointment, Plaintiff was taking Lexapro and clonazepam (AR 513), and Dr. Petro then prescribed Klonopin (AR 515).  Over the next four years, Dr. Petro altered the choice and dosage of medications, increasing Klonopin and retrying Lexapro (AR 584), prescribing Wellbutrin (AR 543) and then Seroquel, which was increased over the years (AR 392, 869, 905, 1063), increasing the clonazepam (AR 419), and trying prazosin, which he increased several times (AR 887, 869, 865, 965, 1078).

Plaintiff indicated that overall he had improvement in his sleeping due to the medications (at most six hours a night), but he continued to have periodic disturbances and nightmares, as well as frequent night sweats.  (AR 390, 418, 513, 556, 582, 595, 864, 886, 904, 1077.)  For example, in August 2004, he reported that he could not sleep from two to four a.m. (AR 542), in July 2005, he reported severe nightmares (AR 867), and in October 2007, he reported nightmares and sleeping only for four hours a night (AR 1056). Plaintiff's irritability and anger also were variable, but he generally indicated he could control it better, and he reported similar results for his panic attacks – they continued, but over time they became more controlled.  (AR 418, 542, 556, 564, 583, 595, 864, 886, 904, 1061, 1077.)  Dr. Petro made two summary observations, one, that Plaintiff's symptoms were impacted significantly by multiple stressors

(AR 868) and, two, that with the prescribed medications and restricted exposure to stress, Plaintiff is stable but at a "low baseline level of functioning." (AR 965, 1057.)

When Plaintiff was admitted to the PTSD inpatient treatment program in May 2003, Dr. Silverman assigned Plaintiff a 55 on the Global Assessment of Functioning scale (GAF); it was documented as being a 51 at discharge. (AR 488, 490.) Dr. Petro assigned Plaintiff a GAF of 40-49 from September 2003 through October 2007. (AR 392, 419, 515, 543, 557, 566, 584, 597, 865, 869, 884, 905, 965, 989, 997, 1057, 1063, 1078.) These numbers were corroborated by other examiners: on October 17, 2003, Plaintiff's Vet Center counselor assigned Plaintiff a GAF of 40 (AR 450); a November 2003 VAMC examination assigned Plaintiff a GAF of 49 (AR 310) (the same number Dr. Petro assigned in September and December 2003 (AR 515, 597); on July 28, 2004, a psychiatrist at the VAMC emergency unit assigned Plaintiff a GAF of 50 (AR 549), while Dr. Petro had assigned a GAF of 49 in June and August 2004 (AR 543, 557); on September 30, 2005, Dr. George Goldman assigned Plaintiff a GAF of 45 (AR 299), the same score assigned by Dr. Petro in August 2005 and at his next visit in March 2006 (AR 865, 997), which was corroborated by Nurse Sabey in March 2006 (AR 1006). Dr. Petro later confirmed that, since May 2003, he did not believe Plaintiff's GAF had been outside the 40s. (AR 1117.) He disagreed with the May 2003 rating of 51 and indicated it was likely assigned by someone without significant knowledge of Plaintiff. (*Id.*)

Counsel requested a subpoena for Dr. Petro, which the ALJ did not rule on prior to the hearing; the ALJ denied counsel's subsequent request to take Dr. Petro's testimony at a supplemental hearing. (AR 178-79, 180.) Plaintiff's counsel recorded an interview with Dr. Petro on November 15, 2007, which he submitted to the ALJ. (AR 1114-19.) In that interview, Dr. Petro stated that Plaintiff's severe PTSD symptoms caused:

> impairing of his ability to relate to other people, be in public, be in traffic, be in a crowd, store, or line of individuals waiting without experiencing severe and intrusive symptoms of PTSD, including anxiety, panic attacks, flashbacks, and episodes of associated rage, which would, of course, interfere with his ability to relate to the public, co-workers, supervisors, and of course, impair his ability to sustain employment.

(AR 1117.) Dr. Petro did not believe Plaintiff had met the criteria for a polysubstance dependence diagnosis since he began treatment for PTSD in 2003. (AR 1118.) Further, even in the absence of any substance abuse, Dr. Petro stated that Plaintiff would continue to have the severe limitations he listed in the social and interpersonal areas, including an inability to appropriately respond to supervisors, co-workers, typical work situations or changes in work setting. (AR 1118-19.) Dr. Petro observed that he found Plaintiff to be very sincere and honest, and his reporting of symptoms was consistent with bona fide PTSD. (AR 1119.)

On April 14, 2008, Plaintiff's counsel recorded a second conversation with Dr. Petro, which he submitted to the ALJ. (AR 1151-57.) Dr. Petro stated that the severity of Plaintiff's PTSD accounts for his memory problems and inability to maintain concentration, and there is no evidence substance abuse is contributing to Plaintiff's mental limitations. (AR 1154-55.)

**Examining Sources**

On August 21, 2003, VAMC Clinical Psychologist Bennett Jennings administered a PTSD Scale. (AR 608-12.) Dr. Jennings found that Plaintiff's symptoms caused him moderate to severe distress, functional impairment, and social and occupational impairment. (AR 612.)

On October 6, 2004, Plaintiff was evaluated by psychologist Andrew Mosko by referral from the VA. (AR 754-65.) Based on his observations during the evaluation, Dr. Mosko found Plaintiff psychologically unstable as exhibited by his anxiety, tension, preoccupations and obsessions. (AR 759.) Dr. Mosko conducted IQ testing, and administered the MMPI-II and the Rorschach Ink Blot Test. (AR 760-62.) Dr. Mosko diagnosed Plaintiff with PTSD, chronic, severe with psychotic intrusions, and mixed personality disorder with avoidant, dependent and histrionic features. (AR 763.) Dr. Mosko noted a decline in Plaintiff's cognitive abilities in the prior year (in comparison to a June 6, 2003 vocational assessment), due to "an intensification of the PTSD symptoms, depression, anxiety, panic and psychotic intrusions." (*Id.*) He concluded that Plaintiff was not employable and was "totally and permanently disabled." (*Id.*)

On March 15, 2005, Dale Halstead, a VAMC psychologist, wrote a memorandum opining that Plaintiff was not capable of working and that his working skills were "completely negated by physical and psychological restrictions." (AR 766.) Halstead noted the following

limitations: lifting over twenty pounds, pushing, pulling, climbing, balancing, kneeling, crouching, crawling, prolonged standing, walking or sitting; exposure to fumes, dust, pollen, and poor ventilation; and cannot work at a fast pace or competitively, nor around others. (*Id.*)

On September 20, 2005, Dr. George Goldman conducted a review examination of Plaintiff for his VA PTSD disability rating. (AR 297.) Plaintiff reported improvements in his nightmares from his medications, only experiencing them about twice a month; he would wake in tears and experience flashes of things from Vietnam. (*Id.*) Plaintiff reported being irritable constantly and easily frustrated, and he worried he might hurt someone. (AR 298.) Plaintiff was oriented and showed no signs of cognitive impairment. Plaintiff reported waking around 10 a.m., taking two naps a day, doing a few chores, and watching movies. (*Id.*) Dr. Goldman diagnosed Plaintiff with PTSD and mixed personality disorder. (*Id.*) He opined that Plaintiff had serious symptoms, and "[h]is disrupted disorganized lifestyle makes him unable to work," because he experiences only brief periods of remission from his PTSD. (*Id.*)

On August 1, 2007, psychologist Jill Plevell conducted a psychological evaluation of Petitioner at the request of the Social Security Administration (SSA). (AR 1030-41.) Plaintiff reported to Dr. Plevell that on a typical day he gets up at 1:00 p.m., watches television, buys something to eat, and sometimes visits his son; on some days he reported staying in bed all day. (AR 1031.) Plaintiff hired someone to clean and goes to stores only at night to avoid crowds and panic attacks. (*Id.*) Dr. Plevell diagnosed Plaintiff with PTSD, Depressive Disorder, NOS, Amnestic Disorder, NOS, and Polysubstance Dependence. (AR 1033.) Dr. Plevell found Plaintiff markedly limited in his ability to understand, remember, and carry out simple and complex instructions; interact with supervisors and co-workers; and respond to work situations and changes in work routine; she found him moderately limited in interacting with the public. (AR 1034-35.) She further concluded that Plaintiff could not manage benefits to his own interest. (AR 1036.) Prior to the November 2007 hearing, Plaintiff's attorney requested a subpoena for Dr. Plevell, which the ALJ denied. (AR 177.)

## Non-examining Sources

On December 13, 2004, psychologist Paul Tangeman reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment of Plaintiff in which he reported that Plaintiff was moderately limited in his ability to work in close proximity to others without distraction; complete a normal work week without interference from psychological symptoms; interact appropriately with the public; accept instruction and criticism; and to get along with coworkers. (AR 455-56.) Dr. Tangeman did not find Plaintiff markedly limited in any categories. (*Id.*) Dr. Tangeman reported that Plaintiff was independent in all daily living activities and retained the ability for basic work tasks without socially stressful demands. (AR 457-58.) Dr. Tangeman also completed a Psychiatric Review Technique form (AR 459-72) and found that Plaintiff had PTSD and depression, not otherwise specified (evidenced by sleep disturbance and decreased energy (AR 459). Dr. Tangeman assigned Plaintiff the following functional limitations: mild restriction on activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence and pace. (AR 340.)

On March 14, 2005, Dr. Jack Marks conducted a Psychiatric Review Technique form based on a review of Plaintiff's records (AR 330-46) and found that Plaintiff had PTSD and depression, not otherwise specified (evidenced by sleep disturbance and decreased energy) (AR 330, 333). Dr. Marks assigned Plaintiff the following functional limitations: mild restriction on activities of daily living; moderate difficulties in maintaining social functioning; and mild to moderate difficulties in maintaining concentration, persistence and pace. (AR 340.) Dr. Marks also filled out a Mental Residual Functional Capacity Assessment, in which he reported that Plaintiff was not limited to moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in close proximity to others without distraction; complete a normal work week without interference from psychological symptoms; interact appropriately with the public; accept instruction and criticism; and get along with coworkers. (AR 344-45.) Dr. Marks did not find Plaintiff markedly limited in any categories. (*Id.*)

## VA Disability Ratings

On February 27, 2003, the VA gave Plaintiff a 20% disability rating (effective August 21, 2001) based on type II diabetes with herbicide exposure. (AR 317-18.) The VA first gave Plaintiff a disability rating based on PTSD, of 30%, on October 3, 2003 (effective on his claim date of June 4, 2003). (AR 313-14.) On January 22, 2004, the VA increased Plaintiff's PTSD disability rating to 70%, also effective June 4, 2003. (AR 310.) The evidence relied upon was a November 25, 2003 examination and Plaintiff's treatment records. (AR 309-10.) The rating was based on Plaintiff's "intrusive thoughts, nightmares, increased physiological distress and reactivity when exposed to reminders of the trauma, avoidance of the reminders, decreased interest in activities, significant to severe sleep disturbances, anger and extreme irritability, decreased ability to concentrate and . . . significant feelings of survivor guilt," difficulty in long-term relationships, "moderate to severe distress in functional impairment," poor concentration and memory, and a GAF of 49. (AR 310.) In April 2004, the VA made a finding that Plaintiff was incompetent for purposes of managing his benefits. (AR 307.)

On October 19, 2005, the VA affirmed Plaintiff's 70% disability rating due to PTSD, based on:

> occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

(AR 294.) The VA reviewed and relied on Dr. Goldman's September 2005 examination, the March 2005 letter from Dr. Halstead, and Plaintiff's VAMC treatment records. (AR 293.) On March 1, 2006, the VA granted Plaintiff entitlement to individual unemployability effective March 14, 2005 (the date of the claim). (AR 287.) The unemployability evaluation, based on service connected disabilities, is "considered permanent and total." (AR 323.)

## Plaintiff's Testimony

On September 21, 2004, Plaintiff completed a Function Report in which he stated that

he took his children to school, attended school himself and picked them up. (AR 239.) He reported taking medication three times a day and napping for a few hours in the afternoon; he was often restless at night, with nightmares, and slept five to six hours a night. (AR 239, 240.) Plaintiff reported preparing simple meals and snacks. (AR 241.) Plaintiff indicated he did some light chores, never shopped, and drove only as necessary for his daily routine. (AR 242.) Plaintiff noted he was antisocial and avoided groups, and his only reported hobby was watching television. (AR 243.) Plaintiff stated he had mood swings, anxiety and depression, and would rather be alone. (AR 244.) He had trouble completing tasks, concentrating and following instructions. (AR 239, 244.)

At the January 11, 2006 hearing before ALJ Buls, Plaintiff reported the primary reason he could not work was his PTSD. (AR 38-39, 51.) Plaintiff testified that he left his last job because he started "doing a bunch of crazy things." (AR 32.) He backed into a truck, he broke water meters because he forgot to disconnect from them, blew out a tire trying to fit the truck through a too-small space, and he disobeyed a foreman. (AR 32-33.) He reported that he lost his strength, his judgment was poor, he had a bad attitude, and he did not feel he could handle working. (AR 34-35.) Plaintiff testified that his medications prevented him from working in the sun and caused muscle spasms, and he had lost his coordination. (AR 37-38, 44-45, 49-50.) Plaintiff stated he had been waking around 7 a.m., fixing a simple breakfast and taking his pills, and then spending most of his time in bed watching DVDs. (AR 42.) Plaintiff indicated he would do a short chore when needed and do laundry but he grocery shopped late at night to avoid people. (*Id.*) Plaintiff reported no hobbies, almost no socializing (except limited interactions with his children), and only limited time outside the house. (AR 43-44.) Plaintiff stated that the VA vocational program removed him from school because he could not handle the psychological stress. (AR 46.)

On November 21, 2007, ALJ Buls held a second hearing, after remand from the Appeals Council. (AR 60.) Plaintiff reported that he left his last job because he had no strength and he got very angry for being written up by a supervisor. (AR 64-65.) He also reported that he had made a lot of careless mistakes on the job and felt like he "wasn't all there." (AR 66.) Plaintiff

indicated little had changed since the last hearing (AR 68-70), however, he reported hiring someone to clean and buying quick food (AR 70).

**Lay Testimony**

On September 7, 2004, Plaintiff was interviewed in person by L. Hunt, an SSA employee. (AR 257-59.) Hunt reported that Plaintiff "seemed spaced out," he had difficulty hearing, reading, understanding, concentrating and answering. (AR 258.)

Plaintiff's wife, Vivian Pena (from whom he is now divorced), completed a Function Report on September 30, 2004. She reported that Plaintiff attempted to take the boys to school every day and attend school himself; in the afternoon he would pick up the kids, nap, get up for dinner and return to bed. (AR 227.) Pena reported that some of Plaintiff's days were chaos and he took many medications. (*Id.*) According to her report, Plaintiff was weak and unable to do much around the house. (AR 229.) Plaintiff would prepare simple meals and snacks for himself, but Pena stated that he was shaky and would forget what he was doing. (AR 229.) Plaintiff drove for scheduled activities but his medications prevented him from being in the sun and would sometimes cause him to become disoriented; she reported doing all of the shopping. (AR 230.) Pena reported that his sleep was affected, that he would be restless during the night, hear noises and sweat profusely. (AR 228.) Plaintiff had no hobbies and normally fell asleep when watching television; Pena stated that Plaintiff was irritable, short-tempered, hard to understand, and the family normally left him alone. (AR 231.) Pena reported that Plaintiff's condition affected his understanding, talking, using his hands, following instructions, hearing, seeing, completing tasks, concentration, memory and his ability to get along with others. (AR 232.) Pena particularly noted that he could not pay attention for long, finish tasks or follow instructions well. (*Id.*) Pena remarked that Plaintiff's behavior on a given day was unpredictable. (AR 234.)

In 2007, Louis M. Casarez wrote a letter based on his knowledge of Plaintiff over a forty-year period. (AR 322.) Casarez reported that in the last eight years Plaintiff had a hard time processing and retaining information, carrying out simple tasks, and his speech had become slow and slurred. (*Id.*)

**Vocational Evidence**

In June 2003, Lynda Weaver, a certified vocational expert, recorded that Plaintiff should avoid work with "physical capacities such as strenuous lifting, carrying, pushing, pulling, climbing, exposure to potentially dangerous situations . . ." (AR 266.) Weaver found Plaintiff was motivated for vocational development, but she noted many barriers to employment including physical limitations, psychiatric disability, chronic pain, and medication side effects. (AR 267, 273.)

On November 19 and 29, 2004, the VA had an Independent Living Vocational Assessment completed of Plaintiff by Judith Hunt, MA, CPC. (AR 276-85.) Based on Plaintiff's inability to compete in the timed tests, Hunt concluded Plaintiff could not be productive at a rate necessary for most employment. (AR 281-82.) She also noted that Plaintiff was only comfortable working with direction, not on his own initiative, and yet could not tolerate working around others due to his PTSD. (AR 282.)

At the first hearing, vocational expert Kathleen McAlpine testified that Plaintiff could not do his past relevant work. (AR 52-53.) This was based on the limitations found by the non-examining doctors, Tangeman and Marks: no functional impairments from physical difficulties; moderate limitations in completing a normal work day and work week without psychological symptoms interrupting, interacting appropriately with the public and coworkers, accepting instruction and criticism, working in close proximity to others without distraction; and between not significantly limited to moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (*Id.*) McAlpine concluded Plaintiff could do other work, such as janitor cleaner and landscaper. (AR 53-54.)

**ALJ's Decision**

The ALJ found Plaintiff had five severe impairments, sleep apnea, asthma (controlled), diabetes type II (controlled), depression NOS, and PTSD.[1] (AR 15.) He concluded Plaintiff

---

[1]     Throughout the decision, the ALJ referenced varying evidence in the record regarding Plaintiff's history of alcohol and cocaine use. (AR 18, 19, 20.) While present drug addiction and/or alcoholism can impact a disability evaluation, *see* Social Security Ruling 82-

could meet the basic demands of unskilled work, and could perform "simple routine tasks with low stress and minimal social contact." (AR 18, 20.)  Based on this assessment, the ALJ found Plaintiff could perform his past relevant work as a laborer (water truck driver).  (AR 21.)

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate DIB claims. 20 C.F.R. § 404.1520; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983).  To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's RFC precludes him from performing his past work.  20 C.F.R. § 404.1520(a)(4).  At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).  If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step.  20 C.F.R. § 414.1520(a)(4).

In this case, Plaintiff was denied at step four of the evaluation process.  Step four requires a determination of whether the claimant has sufficient RFC to perform past work.   20 C.F.R. § 404.1520(e).  Residual functional capacity is defined as that which an individual can still do despite his limitations.  20 C.F.R. § 404.1545.  If the ALJ concludes the claimant has RFC to perform past work, the claim is denied.  20 C.F.R. § 404.1520(f).  An RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms.  Social Security Ruling (SSR) 96-8p.

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)).  The findings of the Commissioner are meant to be conclusive if supported by substantial evidence.  42 U.S.C.

---

60, because the ALJ made no findings on this issue and the parties do not raise it, the Court included only limited evidence regarding this issue in its summary.

§ 405(g).  Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).  The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Matney,* 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1198 (9th Cir. 2004).  The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence."  *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).  Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

## ANALYSIS

### Treating Doctor

Plaintiff argues the ALJ erred in failing to evaluate the opinion of his treating psychiatrist, Dr. Petro.  Dr. Petro had been Plaintiff's treating psychiatrist for more than four years prior to the ALJ's decision.  The records and his interviews with Plaintiff's counsel contained relevant opinions regarding Plaintiff's limitations.  Dr. Petro responded affirmatively when asked by Plaintiff's counsel if Plaintiff would be prevented from responding appropriately to supervisors, typical work situations or changes in work setting because his PTSD symptoms remained severe and caused severe social and interpersonal impairment.[2]  (AR 1119.)  He subsequently reiterated that Plaintiff's PTSD caused "marked impairment in his ability to socialize and interact appropriately" in a workplace setting.  (AR 1153.)  In particular, Dr. Petro

---

[2]    The ALJ noted that Dr. Petro said Plaintiff would have "difficulty" responding to supervisors, colleagues and usual work situations; this was not an entirely accurate representation of Dr. Petro's finding and the ALJ neither credited nor rejected the opinion.

noted that Plaintiff could not be around others or in public without experiencing severe and intrusive PTSD symptoms, which would interfere with his ability to relate to others or sustain employment.  (AR 1117.)

Additionally, for more than four years, Dr. Petro opined that Plaintiff's GAF rating was in the 40s.  The GAF is a 100-point scale that measures a person's overall level of psychological, social and occupational functioning on a hypothetical continuum.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM IV*"), at 32, 34 (4th ed. 2000).  Lower numbers indicate more severe symptoms.  A rating of 41 to 50 indicates serious symptoms or "serious impairment in social, occupational, or school functioning."  *Id.* at 34; *see also Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (noting that a GAF of 50 reflects serious limitations and the vocational expert believed it precluded finding work).

If a treating doctor's opinion is not contradicted, the ALJ must provide "clear and convincing" reasons to reject it.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)).  If a treating doctor's opinion is contradicted by another physician, the ALJ may reject it, if he provides "'specific and legitimate reasons' supported by substantial evidence."  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

The governing regulations provide significant guidance regarding the factors the ALJ should consider when evaluating medical opinions.  Specifically, if a treating physician's opinion is well-supported and not inconsistent with substantial evidence in the record, then the ALJ should give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  If the treating doctor's opinion is not given controlling weight then, in assessing the weight it will be given, the ALJ considers the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. § 404.1527(d)(2)(i)-(ii).  Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the

physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs" and their evidentiary requirements', and the degree of his or her familiarity with other information in the record. 20 C.F.R. § 404.1527(d)(3)-(6).

Although the ALJ acknowledged that Plaintiff received treatment from Dr. Petro, he neglected to discuss Dr. Petro's opinions regarding Plaintiff's limitations and ability to work. This was error and failed to satisfy the requirement that he provide, at a minimum, specific, legitimate reasons supported by substantial evidence for rejecting Dr. Petro's opinion.

A review of the entirety of the record reveals that Dr. Petro's opinion is well-supported and not inconsistent with other substantial evidence in the record. The GAFs assigned by Dr. Petro over the course of four years, which indicate serious impairments, were consistent with GAF scores assigned by numerous other mental health professionals that examined Plaintiff at various points in time. Similarly, other examining physicians made equivalent findings regarding Plaintiff's limitations.[3] In August 2003, Dr. Bennett Jennings found that Plaintiff's PTSD caused moderate to severe functional, social and occupational impairment. (AR 612.) Dr. Goldman concluded that Plaintiff could not work due to the severity of his symptoms and disruptive lifestyle. (AR 298.) Dr. Plevell found Plaintiff had marked limitations in understanding or carrying out even simple instructions, interacting with supervisors and colleagues, and responding to typical work situations. (AR 1034-35.) Effective June 4, 2003, the VA rated Plaintiff 70% disabled based on PTSD causing moderate to severe functional impairment, as well as poor memory and concentration. (AR 310.) The VA subsequently concluded, effective March 2005, that Plaintiff was permanently and totally disabled for purposes of employment. (AR 287, 323.) Both the VA and Dr. Plevell also concluded Plaintiff was not capable even of handling his benefits. (AR 307, 1036.)

_____

[3]    The ALJ rejected the opinions of Drs. Andrew Mosko and Dale Halstead. (AR 20-21.) Their opinions that Plaintiff was unemployable due to psychological restrictions are also consistent with Dr. Petro's finding. (AR 763, 766.) Although the ALJ's basis for rejecting them is challengeable, the Court does not include them in the analysis because Plaintiff did not question the ALJ's rejection of them.

- 16 -

In the midst of an extensive and remarkably consistent record, the only contrary opinions are that of the two non-examining physicians. Drs. Tangeman and Marks both found that Plaintiff only had some mild to moderate limitations and no marked limitations. However, a nonexamining physician's opinion is, without more, not substantial evidence to reject the opinion of a treating physician. *Lester*, 81 F.3d at 831 (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). Further, the ALJ gave "particular weight" to the assessments of these non-examining physicians only because of their expertise in disability claims. (AR 20.) This is a weak rationale is the face of the record evidence. Additionally, that rationale should have applied equally or with greater weight to the opinion of Dr. Plevell, who conducted an examination at the request of the SSA and concluded Plaintiff had marked limitations.

The other evidence which the ALJ cited in finding that Plaintiff did not have marked impairments was that with treatment Plaintiff had improved and was stable, his anger only limited him from doing social work, and his daily activities indicated an ability to work. These findings were based upon isolated portions of the record. Although treatment had certainly helped Plaintiff manage his symptoms, including his anger, the symptoms remained severe and Dr. Petro recorded that with medication Plaintiff is only at a "low baseline level of functioning" (AR 965, 1057). *See Gude v. Sullivan*, 956 F.2d 791, 793-94 (8th Cir. 1992) (noting that being "stabilized" or "doing well" with respect to certain ailments does not mean absence of significant symptoms). This is illustrated by Plaintiff's consistent GAF rating (which evaluates a person's overall functioning) that indicated serious impairment. Further, over the years, Dr. Petro regularly altered Plaintiff's medication type and dosage because he continued to experience significant symptoms and they were ever only "partially controlled with the current medications." (AR 514.) The ongoing severity of Plaintiff's symptoms is also reflected in each examining doctor's opinion and the VA Rating Decisions.

With respect to activities of daily living, the ALJ mentioned only the function reports of Plaintiff and his wife from September 2004, finding that Plaintiff attended school, cared for his children, prepared meals, did house work, and drove a car daily; the ALJ also noted that

Plaintiff participated in vocational rehabilitation. (AR 18.) In addition to the activities reported by the ALJ, Plaintiff's 2004 function report also indicated that he drove only as necessary, did not cook full meals, never shopped, napped for a few hours in the afternoon, avoided groups, and had problems completing tasks and following instructions. (AR 239-44.) Plaintiff's wife's report was similar and also noted that Plaintiff's behavior was unpredictable from day to day and that he was too weak to do much around the house. (AR 227-34.) Additionally, the records reflect that Plaintiff's activities of daily living deteriorated over time and were disrupted easily by stress, as reflected by Plaintiff's three visits to the emergency department in 2004 due to family stressors. Although Plaintiff did begin school through vocational rehabilitation, it was determined that the stress was too much for him psychologically. (AR 46, 276.) Once he stopped attending school, he spent much of his day sleeping and alone. (AR 279, 1031.) Plaintiff testified to this at his first hearing, as well as stating that he only shopped late at night to avoid crowds. (AR 42-44, 46.) He later reported that he had hired someone to clean his house and purchased only quick or prepared food. (AR 70, 1031.) A review of the non-examining physicians' functional capacity assessments (AR 346, 457-58) reveals the ALJ drew his conclusions almost entirely from these evaluations without referring explicitly to them in his opinion. In the face of Dr. Petro's opinion and all the other supporting evidence, these opinions were not supported by substantial evidence.

In sum, every examining physician found that Plaintiff had marked limitations and/or was unemployable. Additionally, the VA Ratings Board, upon examination of the written record found Plaintiff to have moderate to severe impairment and to be completely unemployable. Dr. Petro's opinion was well supported and not inconsistent with substantial evidence in the record, therefore, it is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ's failure to properly evaluate this opinion was error.

**VA Rating Decisions**

In February 2003, the VA issued a Ratings Decision in which it found Plaintiff 20% disabled as of August 21, 2001, based on type two diabetes (AR 317-18); in October 2003, the VA rated Plaintiff 30% disabled based on PTSD (AR 313-14), which was increased to 70% in

January 2004, both effective June 4, 2003 (AR 292-95, 309-10); and in March 2006, the VA granted Plaintiff unemployability, effective March 14, 2005 (the claim date) (AR 287). The 70% rating effective June 4, 2003, was based on Plaintiff's "intrusive thoughts, nightmares, increased physiological distress and reactivity when exposed to reminders of the trauma, avoidance of the reminders, decreased interest in activities, significant to severe sleep disturbances, anger and extreme irritability, decreased ability to concentrate and . . . significant feelings of survivor guilt," difficulty in long-term relationships, "moderate to severe distress in functional impairment," poor concentration and memory, and a GAF of 49. (AR 310.)

Plaintiff argues the ALJ failed to give proper consideration to the VA disability ratings. SSR 06-03p mandates that the ALJ explain the consideration given to the Ratings Decisions but he was not bound by them. Governing circuit law, however, required the ALJ to "give great weight to a VA determination of disability," unless "he gives persuasive, specific, valid reasons . . . supported by the record," for giving it less weight. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (granting benefits because the ALJ failed to consider an 80% VA disability rating based on depression).

In the decision, the ALJ mentioned the VA disability rating of 90% but cursorily discounted it because the VA disability program and the social security disability program were designed to compensate individuals on different grounds. (AR 19.) The ALJ did not mention the VA rating of 100% unemployability effective March 2005. Defendant argues the ALJ did not give weight to the Ratings Decision because it was based on different criteria than that set forth in the Social Security Act. (Dkt. 19 at 4-5.) This argument is contrary to *McCartey*, which requires that an ALJ's decision to give less than great weight to a VA Rating Decision must be based on the <u>record</u>. 298 F.3d at 1076 (noting the "marked similarity" between the social security and veteran's disability programs). The ALJ erred in not providing any record-based reasons for discounting the VA decision.[4] As discussed above with respect to Dr. Petro's

---

[4] The ALJ's decision stated that Plaintiff's PTSD 70% rating was awarded by Dr. Halstead in March 2005. (AR 13, 19.) Dr. Halstead's opinion is not a VA Ratings Decision. As noted above, Plaintiff was rated 70% disabled due to PTSD in January 2004 (retroactive to

opinion and as set forth in the factual background, the VA Rating Decisions are consistent with substantial evidence in the record.  Because the ALJ provided no basis to discount it and it is supported by substantial evidence, the VA Ratings Decision is entitled to great weight.

**Physical Impairments**

Plaintiff argues the ALJ erred by finding he had severe physical impairments at step 2 and then failing to consider them with respect to his RFC.  At step 2, the ALJ found Plaintiff had sleep apnea, asthma (controlled), and diabetes type II (controlled).  (AR 15.)  Contrary to Plaintiff's argument, the ALJ did not fail to address these physical impairments with respect to Plaintiff's RFC.  Rather, the ALJ found that these three conditions were treated and controlled with medication that had no significant side effects, thus, he had no physical exertional limitations.  (AR 20.)

Plaintiff appears to be arguing that, to the extent the ALJ addressed the impairment, the ALJ erred in finding these physical impairments did not impact his RFC.  First, Plaintiff argues that his sleep apnea was causing him to nap during the day, which impacts his ability to work on a regular basis.  The record demonstrates that Plaintiff experienced improvement in his sleep apnea with the CPAP machine. (AR 863, 864.)  While Plaintiff continued to report daytime sleepiness and napping, there is no clear correlation with apnea.  Plaintiff's greatest sleep disturbances, as discussed throughout the record, were anxiety, nightmares, and night sweats.  Thus, while Plaintiff's daytime tiredness could be relevant to his RFC, the ALJ's finding that the sleep apnea provided no significant limitation is supported by substantial evidence.

Second, Plaintiff argues his asthma could affect his ability to do his past work because, as a water truck driver, he could be exposed to weather.  Plaintiff does not point to any record

---

June 2003).  Dr. Halstead's evaluation was submitted for consideration by the VA Rating Board before its October 2005 decision (which reaffirmed the 70% rating), and it was in the file at the time of the March 2006 decision (which granted 100% unemployability).  (AR 287, 293.)  To the extent the ALJ considered Dr. Halstead's opinion and assigned it "less weight" (AR 19), that did not provide the required consideration of the VA ratings decisions.  Further, the ALJ discounted Dr. Halstead's opinion only because it was "without substantial support from the other evidence of record," which is inaccurate and lacks the specificity and persuasiveness required by *McCartey*.

evidence of limitations due to his asthma.  Further, Plaintiff was diagnosed with asthma in July 2002 (AR 357), at which time he was working as a water truck driver.  Again, the ALJ's finding that Plaintiff's asthma did not impose exertional limitations is supported by substantial evidence.  Finally, Plaintiff makes no argument that diabetes impacted his RFC.

**Obesity**

Plaintiff argues the ALJ failed to evaluate Plaintiff's obesity pursuant to SSR 02-1p.

The ALJ evaluated obesity at step 2:

> The undersigned notes that the claimant did not allege obesity anywhere in the application or related documents.  A review of the medical record indicates that the claimant is obese (see Exhibit 1F/56, 161, 364) and there is no indication that any physician has prescribed a weight-loss plan.  Further, no medical sources have indicated that the claimant's obesity has caused or exacerbated his symptoms or limitations.  In addition, the claimant did not raise the issue of obesity or attest to associated symptoms in his testimony.
>
> Nevertheless, to be sure that the undersigned has complied with applicable precedent pursuant to SSR 02-1p, the undersigned has considered whether obesity has been implicitly raised.  The undersigned finds that this is the case here.  The claimant reported that he is 5 feet 4 inches tall and weighs 205 pounds but has no physical problems – "only PTSD" (Exhibit 1E/55).  This corresponds to a Body Mass Index of 35.2.  This is indeed obese (Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults, NIH No. 9804083).  Although the claimant is obese, the medical record demonstrates that he has had no difficulty or complaints with obesity.  Consequently, the undersigned finds that the claimant's obesity does not cause more than minimal limitation in his ability to perform basic work activities per SSR 96-4p, and is therefore, a non-severe impairment.

(AR 16.)[5]

SSR 02-1p directs that an ALJ "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."  An impairment qualifies as severe if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  SSR 02-1p.

---

[5]     Plaintiff complains that, in the ALJ's first opinion, he found Plaintiff's obesity to be a severe impairment and, that without explanation, he changed his mind in his second opinion rendered upon remand.  Because the ALJ's first decision was vacated by the Appeals Council (AR 159), the Court evaluates only whether the ALJ's second decision regarding obesity is supported by substantial evidence.

Plaintiff contends that obesity can cause diabetes and sleep apnea, and can contribute to depression, all conditions with which he has been diagnosed, and he has knee problems, which could be attributed to obesity. The ALJ found that Plaintiff's sleep apnea, depression, and diabetes were all severe impairments; thus, he credited the "related" impairments and/or symptoms of which Plaintiff complains and assessed the impact on his functioning. (AR 15, 18-20.) More importantly, Plaintiff does not point to any record evidence supporting a finding that Plaintiff's obesity, rather than possibly related impairments, significantly limits Plaintiff's ability to do work activities. Although there is documentation in the record that Plaintiff is obese, as found by the ALJ, there is no meaningful discussion of treatment or limitations related to the condition. The Court's review of the record indicates that the ALJ's finding regarding Plaintiff's obesity is supported by substantial evidence.

**Lay Witness Testimony**

Plaintiff argues the ALJ erred in failing to consider the lay testimony of L. Hunt, a social security employee, and Frank Casarez, a long-time friend of Plaintiff. On September 7, 2004, Plaintiff was interviewed in person at a social security field office by Hunt. (AR 257-59.) Hunt reported that Plaintiff "seemed spaced out," he had difficulty hearing, reading, understanding, concentrating and answering. (AR 258.) In 2007, Louis M. Casarez wrote a letter based on his knowledge of Plaintiff over a forty-year period. (AR 322.) Casarez reported that in the last eight years Plaintiff had a hard time processing and retaining information, carrying out simple tasks, and his speech had become slow and slurred. (*Id.*)

ALJs must consider lay witness testimony and rejection of lay testimony requires reasons specific to each witness. *Stout v. Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). The failure to give reasons germane to each lay witness for discounting their testimony will be considered harmless only if a reviewing court is confident that no reasonable ALJ, when fully crediting the testimony, could reach a different conclusion. *Id.* at 1056.

The ALJ's failure to mention or discuss this testimony, although error, was harmless. Standing alone, the value of the evidence is limited in light of its nature and the extensive record. No evidence suggests Hunt met Petitioner more than one time, thus, her insight into

Plaintiff's impairments and its daily impact is minimal.[6] While Casarez has known Petitioner for a long time, he did not provide any information regarding how frequently they had contact. Further, his observations were general to an eight-year time period, including three to four years when Plaintiff was employed. In light of these facts, this evidence is not particularly persuasive. Additionally, the observations by Hunt and Casarez are cumulative of numerous other sources that found Plaintiff had problems with concentration, did not process information well, and had difficulty with simple tasks. For example, the ALJ adopted the non-examining physicians' opinions that Plaintiff had mild to moderate difficulties in concentration, persistence and pace; the ability to carry out detailed instructions; concentrating for extended periods; and completing a normal work week without psychological intrusion. (AR 20, 52-53, 340, 344, 455, 469.) Crediting the additional information from these lay witnesses would not have led to a different disability determination for any reasonable ALJ. *See* 454 F.3d at 1056.

## **Supplemental Vocational Testimony**

The Appeals Council stated that the ALJ should obtain additional testimony from a vocational expert if warranted by the expanded record on remand. (AR 159, 160.) Plaintiff contends the ALJ erred by not obtaining supplemental vocational testimony. In his second decision, after obtaining additional evidence, the ALJ found Plaintiff had essentially the same RFC as he did in his first decision – the ability to do simple routine tasks with low stress and minimal social contact. (AR 18, 20, 82.) Because the ALJ found the same RFC, arguably he may not have required additional vocational testimony. However, in light of the treating doctor's opinion and the VA Rating Decisions, the RFC does not appear to be supported by substantial evidence. As discussed below, the current record is sufficiently developed for the Court to award benefits without additional evidence. Therefore, whether the ALJ erred in

_____

[6] It was unquestionably error not to discuss Casarez's letter as it was lay testimony submitted for purposes of the proceeding. In contrast, the remark by Hunt, while relevant was not submitted by Plaintiff nor is it the typical lay witness testimony addressed by the courts. *See Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) ("friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition.").

failing to obtain supplemental vocational is irrelevant.

**__Remedy__**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). When a court finds that an administrative decision is flawed, the remedy should generally be remand for "additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2006) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)); *see also Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). However, "where the record has been developed fully and further administrative proceedings would serve no useful purpose, the . . . court should remand for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). The Ninth Circuit adopted such a rule in recognition of the importance of expediting disability claims. *Varney v. Sec'y of Health and Human Serv.*, 859 F.2d 1396, 1401 (9th Cir. 1984). Courts credit improperly rejected evidence and remand for benefits when: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996). In this case, a remand for an immediate award of benefits to Plaintiff is warranted.

First, the ALJ failed to provide any explanation for rejecting Dr. Petro's opinion and failed to consider and properly weigh the VA Rating Decisions. Second, the record is extensive and fully developed, therefore, no additional evidence is needed. Third, when the evidence before the ALJ is properly credited a finding of disability is compelled. Dr. Petro's opinion that Plaintiff had serious impairments that severely interfered with his ability to relate to the public, co-workers and supervisors, to appropriately respond to typical work situations or changes in work routine, and sustain employment (AR1117-19) is controlling. It is supported by substantial other evidence in the record. The SSA consulting examiner Dr. Plevell found Plaintiff to be markedly limited in these areas, as well as in his ability to understand and carry out simple instructions. Dr. Goldman found Plaintiff unemployable due to his severe PTSD symptoms, which led to a disruptive lifestyle. (AR 298.) In a vocational assessment for

independent living, Judith Hunt, MA, CPC, concluded that Plaintiff could not be productive at a rate necessary for most employment. (AR 281-82.) She also noted that Plaintiff is only comfortable working with direction, not on his own initiative, and yet cannot tolerate working around others. (AR 282.) Plaintiff and his wife reported that his memory and concentration were poor, and he had difficulty following instructions (AR 232, 239, 244, 408); other witnesses including a therapist, a group support moderator, Hunt (an SSA employee), and his friend Casarez reported similar limitations (AR 258, 322, 424, 813-14).

As set forth in SSR 85-15, regarding nonexertional impairments:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

*See also* 20 C.F.R. § 404.1521(b) (defining basic work activities). Because the controlling opinion of Dr. Petro, which is supported by substantial evidence in the record, establishes that Plaintiff cannot perform the basic work activities necessary for most jobs, a finding of disability is warranted. Additionally, the VA Ratings Decisions that Plaintiff had moderate to severe impairments and was permanently and totally unemployable is entitled to great weight. These findings conclusively establish that Plaintiff cannot perform his past relevant work nor any other work that exists in substantial numbers in the national economy.

The circumstances of this case make an award of benefits, rather than a remand for additional explanation, particularly appropriate. Plaintiff first sought benefits more than five years ago. The Appeals Council found the ALJ's initial decision flawed in numerous respects and remanded it for additional findings. The ALJ failed to comply with most of the requirements of the remand order. The ALJ obtained an additional mental health examination, by Dr. Plevell, but ignored her findings that Plaintiff had marked limitations and their relevance to Plaintiff's RFC. The ALJ failed to explain adequately the lack of weight given to the VA Disability Ratings. Finally, the ALJ chose not to obtain additional vocational evidence but

changed his initial opinion and determined, contrary to the only vocational evidence of record, that Plaintiff could perform his prior work. Despite these errors in failing to comply with the remand order, as well as other errors, the Appeals Council denied review. In light of the Commissioner's failure to rectify the errors at any level, after several opportunities and multiple years, and Plaintiff's clear entitlement to benefits based on the record, an award of benefits without further delay is justified.

## RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends the District Court, after its independent review, enter an order granting Plaintiff's motion for summary judgment (Dkt. 15) and remanding the matter for an award of benefits.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CV-08-615-TUC-RCC**.

DATED this 16th day of December, 2009.

D. Thomas Ferraro
United States Magistrate Judge

- 26 -